**THOMAS P. SMITH, JR.**
**CO-ACTING REGIONAL DIRECTOR**
Celeste A. Chase
Richard Hong
Derek M. Schoenmann
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0956 (Hong)
hongr@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | <u>COMPLAINT</u> |
| Plaintiff, | 22 Civ. _____ (    ) |
| -against- | |
| FERNANDO MOTTA MORAES, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendant Fernando Motta Moraes ("Moraes"), alleges as follows:

**SUMMARY**

1. This is an insider trading case alleging that Moraes illegally traded stock and options of NYSE-listed Dun & Bradstreet Corporation ("DNB").

2. On August 8, 2018, DNB announced (the "Announcement") that it had agreed to be acquired by a private investor group (the "Investor Group") in an all-cash transaction for $145 per share (the "Acquisition"), which represented a 15% premium to its then-current market price.

3. About a week before the Announcement, Moraes learned about the Acquisition from an investment adviser that was part of the Investor Group (the "Adviser") pursuant to a

non-disclosure agreement (the "NDA") entered into by Moraes's employer, Worth Capital Holdings LLC (together with various affiliated investment vehicles, "Worth Capital"). The NDA required all Worth Capital personnel – including Moraes – to keep confidential all information about the Acquisition and to use it "solely for the purpose of evaluating" whether to participate in the transaction alongside the Adviser.

4. After Worth Capital's principal, Charles Rustin Holzer ("Holzer"), executed (or directed Moraes to execute) the NDA on behalf of Worth Capital, Moraes emailed the signed NDA back to the Adviser, copying Holzer. Shortly thereafter, the Adviser shared with Moraes and Holzer the name of the Acquisition target (DNB), the $145 per share purchase price, the anticipated date of the public Announcement (on or before August 9, 2018), and other material non-public information ("MNPI"), including a 109-page investment presentation deck (the "Investment Deck") replete with detailed, confidential financial information about DNB and the Acquisition.

5. Unknown to the Adviser, however, Moraes knowingly or recklessly misappropriated the MNPI he learned pursuant to the NDA and used it to trade DNB options ahead of the Announcement in breach of the NDA. After the Announcement caused DNB's stock price to rise to match the $145 per share acquisition price, Moraes realized $8,842 in profits on his DNB options trades.

6. In addition to trading on MNPI provided by the Adviser, Moraes, in further violation of the NDA, knowingly or recklessly provided MNPI about DNB to a business associate, Trader-1, who traded on that information. Trader-1 realized more than $65,000 in profits from that trading.

**VIOLATIONS**

7. By virtue of the foregoing conduct and as alleged further herein, Moraes has violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8. Unless Moraes is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

9. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d) and 78t-1].

10. The Commission seeks a final judgment: (a) permanently enjoining Moraes from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Moraes to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; (c) ordering Moraes to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; (d) ordering that Moraes be permanently barred from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

11. This Court has jurisdiction over this action pursuant to Sections 21, 21A, and 27

of the Exchange Act [15 U.S.C. §§ 78u, 78u-1, and 78aa].

12. Moraes, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Southern District of New York. At all times relevant to this action, the securities Moraes traded illegally were traded on the New York Stock Exchange ("NYSE"), which is located in this District. Moraes resides in this District, and his employer, Worth Capital, is headquartered in this District. In addition, Moraes received MNPI from the Adviser (also headquartered in this District) pursuant to an NDA executed in this District.

## DEFENDANT

14. **Moraes**, age 42, resides in New York, New York. Moraes is the Chief Operating Officer and Controller (and sole employee) of Worth Capital. Moraes does not hold any securities licenses and is not registered with the Commission in any capacity.

## RELEVANT PERSONS AND ENTITIES

15. **DNB** is a Delaware corporation headquartered in Jacksonville, Florida that provides commercial data, analytics, and trade credit and risk management services. During the relevant period, DNB's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NYSE. Prior to its Acquisition by the Investor Group, DNB filed periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules thereunder. DNB went public

again in July 2020 and is once again listed on the NYSE.

16. **The Adviser** is a registered investment advisory firm headquartered in New York, New York. The Adviser invests in alternative assets classes, including private equity, real estate, distressed credit, and hedge funds.

17. **Worth Capital** is a real estate-focused family office owned by the Holzer family and headquartered in New York, New York. Holzer is the Managing Member of Worth Capital. In addition to real estate, Worth Capital periodically invests in private equity-type transactions, typically through an investment adviser (including the Adviser).

18. **Trader-1**, an individual residing in Sullivan's Island, South Carolina, is the sole owner and managing member of a family office that invests in commercial real estate, restaurants, and other property-based businesses. Trader-1 is a business associate of Moraes and Holzer who periodically invests in private equity-type transactions alongside or through Worth Capital. Trader-1 does not hold any securities licenses and is not registered with the Commission in any capacity.

## BACKGROUND ON CALL OPTIONS

19. A "call" option gives its purchaser-holder the right, but not the obligation, to buy shares of an underlying stock at a specified price (the "strike price") prior to the expiration date. Generally, the buyer of a call option anticipates that the price of the underlying stock will increase prior to the expiration date. Call options are generally sold in a "contract," which gives the option holder the opportunity to buy 100 shares of the underlying stock at the strike price.

## FACTS

**I.  Moraes Obtained MNPI about the Acquisition from the Adviser Pursuant to an NDA.**

20. On or about May 19, 2018, a member of the Investor Group executed a

confidentiality agreement with DNB's board of directors to engage in due diligence in connection with a potential business transaction.

21. On July 9, 2018, the Investor Group made a non-binding offer to take DNB private at a price of $145 per share. Following continued negotiations, DNB management presented the Investor Group with a draft merger agreement on July 26, 2018.

22. On July 27, 2018, a managing partner of the Adviser, which was a member of the Investor Group, called Holzer to discuss an investment opportunity initially on a "no names" basis, pending execution of a non-disclosure agreement. Holzer had been a client of the Adviser and Worth Capital had invested in prior real estate and private equity-type deals through the Adviser.

23. Holzer expressed interest, and shortly after the call, the Adviser sent Holzer and Moraes a draft of the NDA addressed to Worth Capital. The NDA required Worth Capital and its "Representatives" (defined to include all officers, employees and affiliates) to keep confidential any information provided by the Adviser and to use such information "solely for the purpose of evaluating financing alternatives for the benefit of [the unnamed acquisition target]," which it described as a "leading publicly listed commercial data and analytics company." The NDA also prohibited disclosure "that discussions or negotiations are taking place concerning a possible transaction with" the acquisition target.

24. On July 30, 2018, Holzer signed, or directed Moraes to sign, the NDA on behalf of Worth Capital. Moraes then emailed the signed NDA back to the Adviser, copying Holzer.

25. Approximately half an hour later, the Adviser sent Holzer and Moraes the 109-page Investment Deck. The Investment Deck was labeled "Strictly Private and Confidential," and included a statement that it was prepared on the basis of "~10 weeks of access to confidential

company information" obtained by the Investor Group and its advisors pursuant to various non-disclosure agreements.

26.     The Investment Deck identified the target of the proposed acquisition as DNB and the acquisition price as $145 per share (a 15.1% premium to DNB's last closing price), and noted the parties' intent to sign and announce a transaction before DNB's earnings call scheduled for 8:00AM EST on August 9, 2018, all of which was non-public information.  A reasonable investor would have viewed this information as material to a decision whether to buy or sell DNB securities.

27.     The Investment Deck also included a detailed analysis of DNB's current and projected performance and other non-public information collected during the due diligence process.  Among other things, the Investment Deck: (i) identified and analyzed "robust value creation opportunities" justifying the proposed ~15% purchase premium; (ii) identified potential cost-savings opportunities totaling up to $350 million; and (iii) noted that DNB was "significantly undermanaged" based on an analysis of the company's current management team, as well as its organizational and reporting structure, systems, incentive programs, culture, and performance tracking methodologies.  A reasonable investor would have viewed the foregoing information contained in the Investment Deck as material to a decision whether to buy or sell DNB securities.

28.     Over the next week, Holzer and/or Moraes participated in multiple calls and email exchanges with representatives of the Adviser in which they received, among other things, updates on the progress of the final merger agreement and the timing of the Announcement.  A reasonable investor would have viewed the foregoing information as material to a decision whether to buy or sell DNB securities.

29. On or about August 5, 2018, Holzer made a verbal commitment to the Adviser that Worth Capital would contribute $5 million to the DNB Acquisition. Thereafter, the Adviser repeatedly and unsuccessfully tried to reach Holzer (directly and through Moraes) to obtain a signed subscription agreement formalizing Worth Capital's commitment.

30. Moraes was aware that in prior deals, including private equity-type deals with the Adviser, Holzer's practice was to informally pledge a significant amount up front, then later attempt to bring in other investors to share in the risk before finalizing Worth Capital's commitment. Similarly, here, following the Announcement, and after finally executing a subscription agreement with the Adviser for $5 million, Holzer reduced Worth Capital's commitment to $1.5 million and brought in another investor to assume another $1.5 million.

II. **Moraes Traded in DNB Options Ahead of the Announcement.**

31. On July 30, 2018, less than an hour after receiving the Investment Deck identifying DNB as the acquisition target and disclosing the $145 per share purchase price, the expected date of the Announcement, and other MNPI, Moraes bought 5 DNB Aug. 17, 2018 calls (with a $115 per share strike price) for $5,508 (including commissions) in a brokerage account in his name. This was the first time Moraes had traded DNB stock or options.

32. DNB's board of directors approved the Acquisition on August 8, 2018, and the Acquisition was announced to the public later that day after the markets closed. The next day, DNB stock closed at 142.21, up 16% from its closing price on August 8.

33. The day after the Announcement (August 9, 2018), Moraes sold his 5 DNB calls for $14,350, realizing a net profit of $8,842 (a 161% return).

34. Moraes's purchase of 5 DNB call options on July 30, 2018 was made on the basis of MNPI that he knowingly or recklessly misappropriated from the Adviser. Moraes learned the

8

MNPI pursuant to the NDA, which imposed on him a duty to keep the information confidential and to not trade on the information. Moraes knew or was reckless in not knowing that he was in possession of MNPI about DNB, and that by trading on that information he was breaching his duty of confidentiality to the Adviser.

### III. Moraes Tipped MNPI to Trader-1, Who Also Traded Ahead of the Announcement.

35. Trader-1, who had invested in private equity-type transactions alongside or through Worth Capital in the past, had asked Holzer and Moraes to inform him about new Worth Capital deals in which he might want to participate.

36. On the evening of August 7, 2018, the day before the Announcement, Moraes called Trader-1 and they spoke for 10 minutes. On that call, Moraes told Trader-1 that Worth Capital had been invited to participate in an acquisition of DNB by a private investor group, and he asked if Trader-1 would like to invest in the Acquisition alongside or through Worth Capital. Moraes told Trader-1 that the deal had a "short fuse," meaning that it would happen quickly.

37. Trader-1 asked Moraes if there was a written investment proposal or deal "book." Moraes responded that there was, but that he could not share it with Trader-1 because it was subject to a confidentiality agreement. Instead, Moraes provided Trader-1 with an oral summary of the Acquisition, which was itself a breach of the NDA.

38. Moraes did not ask Trader-1 to sign a non-disclosure agreement himself, or for a verbal commitment not to trade in DNB stock or options. Moraes and Trader-1 did not discuss stock or options trading during their conversation about DNB on August 7.

39. About an hour after his call with Moraes on the evening of August 7, 2018, Trader-1 placed an order in his online brokerage account to purchase 1,000 shares of DNB stock at the then-market price of $125.85 per share. The market was closed, however, and Trader-1

later cancelled the order before it could be executed.  The next morning, August 8, Trader-1 began purchasing DNB Aug. 17, 2018 calls (with a $130 per share strike price), amassing a total of 60 calls for $9,660 in premiums over a period of a few hours.  Trader-1 had not previously traded in DNB stock or options, and would not have purchased the DNB options on August 8, 2018 but for Moraes's disclosure of MNPI.

40.  After the Announcement, Trader-1 exercised his call options on the August 17, 2018 expiration date, and sold the resulting shares ten days later for a net profit of $65,332.

41.  The information that Moraes communicated to Trader-1 about the upcoming DNB Acquisition was MNPI that Moraes learned from the Adviser pursuant to the NDA.  Moraes had a duty not to disclose that information, and he knowingly or recklessly breached that duty by communicating the information to Trader-1.  Moraes knew or recklessly disregarded the risk that Trader-1 would trade on the information.

42.  Moraes expected to benefit from his disclosure of MNPI to Trader-1.  Moraes knew that Trader-1 was a valuable co-investment partner for Worth Capital and had asked to be kept informed about attractive deals.  Moraes also knew that Holzer had verbally committed $5 million to the Adviser up front, but had been unwilling to formalize the commitment, and that Holzer's practice in such situations was to look for other investors to share his risk.  By telling Trader-1 about the Acquisition in an effort to bring him into the deal, Moraes sought to improve his standing with his employer and possibly increase his compensation.

## CLAIM FOR RELIEF
### Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

43.  The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 42.

44.  Moraes, directly or indirectly, in connection with the purchase or sale of securities

and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

45. By reason of the foregoing, Moraes, directly or indirectly, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Moraes from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Moraes to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violation pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

### III.

Ordering Moraes to pay civil monetary penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**IV.**

Permanently prohibiting Moraes from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.


Dated: New York, New York
       September 30, 2022

                              */s/ Thomas P. Smith, Jr.*
                              THOMAS P. SMITH, JR.
                              CO-ACTING REGIONAL DIRECTOR
                              Celeste A. Chase
                              Richard Hong
                              Derek M. Schoenmann
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              100 Pearl Street, Suite 20-100
                              New York, New York 10004-2616
                              (212) 336-0956 (Hong)
                              hongr@sec.gov